No. 25-40137

IN THE UNITED STATES COURT OF APPEALS
FOR THE FIFTH CIRCUIT

R.J. REYNOLDS TOBACCO COMPANY; Santa Fe Natural Tobacco
Company, Incorporated; ITG Brands L.L.C.; Liggett Group L.L.C.; Neocom,
Incorporated; Rangila Enterprises, Incorporated; Rangila L.L.C.; Sahil
Ismail, Incorporated; Is Like You, Incorporated,

Plaintiffs-Appellees,

v.

FOOD & DRUG ADMINISTRATION; United States Department of Health
and Human Services; Marty Makary, Commissioner, U.S. Food and Drug
Administration; Robert F. Kennedy, Jr., Secretary, U.S. Department of
Health and Human Services,

Defendants-Appellants.

On Appeal from the United States District Court
for the Eastern District of Texas

CORRECTED REPLY BRIEF FOR APPELLANTS

*Of Counsel:*

ROBERT FOX FOSTER
 *Acting General Counsel*
 *Department of Health & Human Services*
 *Chief Counsel for Food, Research & Drugs*

SEAN R. KEVENEY
 *Chief Counsel*
 *Food & Drug Administration*

WENDY S. VICENTE
 *Deputy Chief Counsel, Litigation*

JULIE LOVAS
 *Senior Counsel*
 *Office of the Chief Counsel*

ERIC D. McARTHUR
 *Deputy Assistant Attorney General*

JAY R. COMBS
 *Acting United States Attorney*

DANIEL TENNY
URJA MITTAL
 *Attorneys, Appellate Staff*
 *Civil Division, Room 7248*
 *U.S. Department of Justice*
 *950 Pennsylvania Avenue NW*
 *Washington, DC 20530*
 *(202) 353-4895*

# TABLE OF CONTENTS

**Page**

INTRODUCTION AND SUMMARY OF ARGUMENT ...............................1

ARGUMENT....................................................................................3

I.  The Tobacco Control Act Authorizes FDA to Revise
    Cigarette Warnings to Promote Greater Public
    Understanding of the Risks of Smoking..............................................3

    A.  FDA properly exercised its statutory authority to
    issue revised warnings .............................................................3

    B.  FDA acted within its statutory authority in selecting
    eleven warnings........................................................................8

    C.  FDA's rulemaking did not violate any sequential
    rulemaking requirement........................................................12

    D.  FDA's rulemaking was not arbitrary and capricious...............15

II.  No Preliminary Injunction Was Warranted.....................................24

III. Any Relief Should Be Limited to the Parties and the
    Invalid Aspects of the Rule..............................................................26

CONCLUSION ..................................................................................33

CERTIFICATE OF SERVICE

CERTIFICATE OF COMPLIANCE

## TABLE OF AUTHORITIES

**Cases:**                                                                 **Page(s)**

*Air Transp. Ass'n of Am. v. FAA,*
169 F.3d 1 (D.C. Cir. 1999) ................................................................. 17

*Airlines for Am. v. Department of Transp.,*
110 F.4th 672 (5th Cir. 2024) ............................................................. 28

*American Hosp. Ass'n v. Azar,*
983 F.3d 528 (D.C. Cir. 2020) ............................................................ 23

*American Textile Mfrs. Inst., Inc. v. Donovan,*
452 U.S. 490 (1981) ........................................................................... 16

*Career Colls. & Schs. of Tex. v. U.S. Dep't of Educ.,*
98 F.4th 220 (5th Cir. 2024) .......................................................... 29, 30

*FDA v. Wages & White Lion Invs., LLC,*
604 U.S. 542 (2025) ........................................................................... 19

*Gulf Restoration Network v. U.S. Dep't of Transp.,*
452 F.3d 362 (5th Cir. 2006) .............................................................. 18

*Jones v. Hendrix,*
599 U.S. 465 (2023) ........................................................................... 13

*Kennecott Greens Creek Mining Co. v. Mine Safety & Health Admin.,*
476 F.3d 946 (D.C. Cir. 2007) ....................................................... 20-21

*Loper Bright Enters. v. Raimondo,*
603 U.S. 369 (2024) ...................................................................... 23, 24

*Medina Cnty. Env't Action Ass'n v. Surface Transp. Bd.,*
602 F.3d 687 (5th Cir. 2010) .......................................................... 19, 22

*Michigan v. EPA,*
576 U.S. 743 (2015) ........................................................................... 16

*National Truck Equip. Ass'n v. NHTSA,*
711 F.3d 662 (6th Cir. 2013) .............................................................. 17

*Philip Morris USA Inc. v. FDA,*
   No. 2:24-cv-143, 2025 WL 2494732 (S.D. Ga. Aug. 29, 2025) ......... 8, 23, 27

*R.J. Reynolds Tobacco Co. v. FDA,*
   96 F.4th 863 (5th Cir.), *cert. denied,* 145 S. Ct. 592 (2024) ........................ 18

*R.J. Reynolds Tobacco Co. v. FDA,*
   696 F.3d 1205 (D.C. Cir. 2012) ............................................................ 30

*Rudisill v. McDonough,*
   601 U.S. 294 (2024) ................................................................................. 7

*Seven Cnty. Infrastructure Coal. v. Eagle County,*
   145 S. Ct. 1497 (2025) ............................................................................ 19

*Sinclair Wyo. Refin. Co. v. EPA,*
   101 F.4th 871 (D.C. Cir. 2024) ............................................................. 17

*Texas v. United States,*
   126 F.4th 392 (5th Cir. 2025) ............................................................... 27

*Trump v. CASA, Inc.,*
   606 U.S. 831 (2025) ......................................................................... 27, 28

**Statutes:**

Family Smoking Prevention and Tobacco Control Act,
   Pub. L. No. 111-31, div. A, § 202, 123 Stat. 1776, 1845 (2009) .................10

5 U.S.C. § 702 ........................................................................................ 28

5 U.S.C. § 705 ........................................................................................ 28

15 U.S.C. § 1333 ...................................................................................... 4

15 U.S.C. § 1333(a)(1) ..................................................................... 1, 12, 13

15 U.S.C. § 1333(b)(1) ........................................................................... 12

15 U.S.C. § 1333(c)(1) ............................................................................. 6

15 U.S.C. § 1333(d)[1] ................................................................ 5, 6

15 U.S.C. § 1333(d)[2] ......................... 1, 3, 5, 6, 8, 11, 13, 17, 24

21 U.S.C. § 387 note ...................................................... 23, 25, 26

**Regulatory Materials:**

Exec. Order No. 12,866, § 10,
    58 Fed. Reg. 51,735 (Oct. 4, 1993) ....................................... 17

Exec. Order No. 13,563, § 7(d),
    76 Fed. Reg. 3,821 (Jan. 21, 2011) ....................................... 17

**Other Authorities:**

*Adjust*:
    Merriam-Webster Dictionary,
        https://www.merriam-webster.com/dictionary/adjust ...................7
    Oxford English Dictionary,
        https://www.oed.com/dictionary/adjust_v2....................................7

84 Fed. Reg. 42,754 (Aug. 16, 2019) ............................... 14, 19, 23

85 Fed. Reg. 15,638 (Mar. 18, 2020) ................. 15, 16, 17, 20, 21, 26, 29, 31

Antonin Scalia & Bryan A. Garner, *Reading Law:*
    *The Interpretation of Legal Texts* (2012)....................................5, 6

## INTRODUCTION AND SUMMARY OF ARGUMENT

Although Congress made abundantly clear in the Tobacco Control Act that it was authorizing the Food and Drug Administration to select cigarette warnings that would promote public understanding of the risks of tobacco use, plaintiffs contend that Congress instead required the agency to maintain faulty warnings, eschew effective warnings, and, even to the extent it was allowed to improve the warnings, to undertake a rulemaking to implement imperfect warnings before undergoing a second rulemaking to improve them. None of these propositions is supported by the statutory text or common sense. Plaintiffs' efforts to second-guess FDA's scientific judgments fare no better. The district court's judgment should be reversed.

**1.** Congress enacted a default set of text warnings for cigarette packages and advertisements but expressly delegated to FDA the authority to adjust the text of those warnings when doing so would enhance public understanding of the risks of tobacco use. *See* 15 U.S.C. § 1333(a)(1), (d)[2]. There is no merit to plaintiffs' contention that Congress did not mean what it said and wanted FDA to make only cosmetic changes to the warnings. Nor did Congress elevate above all other considerations the need to have exactly nine warning statements—despite never mentioning that number—

simply by including a list of default statements in the original enactment that happened to number nine.  Congress did not render FDA powerless to eliminate a warning if it was no longer contributing to public understanding, or to add a warning if the science suggested that doing so was appropriate, without adding or deleting a different warning just to hit a magic number.

Nor does the text provide any basis for plaintiffs' insistence that even if FDA concludes different warnings would be superior, FDA must first implement the suboptimal default warnings that Congress included in the statute (notably, alongside the express authority for FDA to change them) and then undergo a second rulemaking to change them.

Finally, plaintiffs invite this Court to second-guess FDA's determination regarding which warnings would be most effective.  But this Court has already concluded that the selected warnings would be effective, and in any event, plaintiffs do not come close to meeting the high burden required for a court to override FDA's scientific judgment.

**2.**  Plaintiffs also misapply the remaining preliminary-injunction factors.  Both Congress and the agency specified that the proper remedy is to invalidate the warnings as applied to plaintiffs, rather than to strike

them down entirely or to postpone the effective date of the entire rule universally. Plaintiffs can suggest otherwise only by insinuating that the district court was entitled to ignore Congress's express judgment when exercising its equitable discretion.

## ARGUMENT

I.    **The Tobacco Control Act Authorizes FDA to Revise Cigarette Warnings to Promote Greater Public Understanding of the Risks of Smoking.**

A.    **FDA properly exercised its statutory authority to issue revised warnings.**

The Tobacco Control Act (TCA) directed FDA to implement new cigarette warning requirements that would replace the outdated Surgeon General's warnings and authorized FDA to "adjust the … text of any of the label requirements … if the Secretary finds that such a change would promote greater public understanding of the risks associated with the use of tobacco products." 15 U.S.C. § 1333(d)[2]. That is precisely what FDA did when it issued the 2020 rule. The eleven warnings in the rule comprise a combination of default warnings from the TCA and warnings developed by FDA based on consumer research studies and scientific findings.

Plaintiffs are wrong to suggest that FDA has authority to make only trivial or nonsubstantive changes to the text. Authority to alter the "text" is

3

not naturally read as limited to altering "the typographical aspects of the words of the label requirement" and "not [the] substantive content." Resp. Br. 32. The other subsections of 15 U.S.C. § 1333 also use the word "text" in accord with its natural meaning of the words selected (*but see* Resp. Br. 33). In those provisions, however, the context makes clear that Congress intended to limit the sort of changes that FDA could make to the text. Section 1333(a)(2) is titled "Placement; typography; etc." and articulates the requirements for label statements on cigarette packages; it uses the word "text" to refer to the words of the warning and then addresses the visual characteristics of those words (*e.g.*, the color of the text, the font type, etc.). So too with Section 1333(b)(2), which is titled "Typography, etc." and enumerates the requirements for cigarette advertising. Neither provision uses the word "text" to refer to the formatting attributes or "typographical element[s]" of the warnings. *Id.* Rather, both provisions use other words to make clear that they address the font, color, type, and other features of the warning statements on cigarette packages or in cigarette advertisements.

Plaintiffs' argument is further undermined by the fact that the statute expressly, but separately, authorizes FDA to alter the "format" and "type

size" of the warnings—that is to say, the typographical aspects of the words.  And their argument gets worse still when the circumstances in which FDA can change the text are considered: if "such a change would promote greater public understanding of the risks associated with the use of tobacco products," 15 U.S.C. § 1333(d)[2]—an odd standard to associate with nonsubstantive adjustments.

The last straw is that Congress, in the immediately adjacent provision, allowed only changes that would ensure that the label contents are "clear, conspicuous, legible and appear within the specified area," *id.* § 1333(d)[1], instead of inviting FDA to consider their substance as Section 1333(d)[2] does.  Congress also expressly required a notice-and-comment rulemaking for changes under Section 1333(d)[2], while allowing the nonsubstantive changes to be made "as the Secretary determines appropriate" under Section 1333(d)[1].  *See* Antonin Scalia & Bryan A. Garner, *Reading Law: The Interpretation of Legal Texts* 167 (2012) ("[T]he whole-text canon … calls on the judicial interpreter to consider the entire text, in view of its structure and of the physical and logical relation of its many parts.").

The different titles of the two provisions also reflect their different aims. Section 1333(d)[2] is focused on FDA's authority to revise the substantive content of the warnings and is therefore titled "Change in required statements," while Section 1333(d)[1] is focused on the creation of accompanying graphics and is therefore titled "Graphic label statements." Plaintiffs do not explain why Congress would caption a provision "Change in required statements" if it did not mean to allow FDA to change the statements in any meaningful way. *Cf.* Scalia & Garner, *supra*, at 221 ("The title and headings are permissible indicators of meaning.").

Other features of the text confirm that Section 1333(d)[2], unlike Section 1333(d)[1], authorizes FDA to revise the content of the default TCA warnings. In Section 1333(d)[2], Congress used the phrase "any of the label requirements" to refer to cigarette warnings more generally, in the context of FDA's authority to update those warnings to promote public understanding of tobacco's health risks. *See* 15 U.S.C. § 1333(d)[2]. In contrast, in Section 1333(d)[1], Congress used the phrase "label statements specified in subsection (a)(1)" to reference the nine default warnings in the TCA, just as it did elsewhere. *See, e.g., id.* § 1333(c)(1), (d)[1]. These are two different statutory phrases in two different statutory provisions that have

two different statutory meanings. *See Rudisill v. McDonough*, 601 U.S. 294, 308 (2024) ("[W]e generally 'presume differences in language like this convey differences in meaning.'"). Plaintiffs are right that the reference to "label requirements" in Section 1333(d)[2] refers to both the text and graphics (Resp. Br. 22), but this just means that the provision authorizes FDA to change either the text or the graphics if the Secretary finds such a change would promote greater public understanding of tobacco's risks.

Plaintiffs mistakenly assert, based on a single, hand-picked dictionary definition, that the statute's use of the word "adjust" limits FDA to making "slight[]" changes under both Sections 1333(d)[1] and 1333(d)[2]. Resp. Br. 32. But "adjust" is widely defined more broadly to mean "to bring to a more satisfactory state" or "to make correspondent or conformable: adapt." *Adjust*, Merriam-Webster Dictionary, https://www.merriam-webster.com/dictionary/adjust (definitions 1.a., 1.b); *see also Adjust*, Oxford English Dictionary, https://www.oed.com/dictionary/adjust_v2 (definition 1.a). In context, Congress's choice of the word "adjust" means that FDA has the authority to alter the text and graphics of the warnings to make them "more

satisfactory"—specifically, more satisfactory in light of the statutory aim of promoting public understanding of tobacco's risks.

### B.    FDA acted within its statutory authority in selecting eleven warnings.

**1.** Plaintiffs fare no better in ascribing talismanic significance to the fact that Congress's default set of warnings included nine statements. They point to no evidence that the exact number of warnings was significant to Congress. Instead, they suggest that Congress regarded the nine warnings it selected as the best way to inform the public about the risks associated with tobacco products. That may be so, but as discussed, Congress expressly authorized FDA to change the warnings if "such a change would promote greater public understanding of the risks associated with the use of tobacco products." 15 U.S.C. § 1333(d)[2]. Thus, although the nine warnings in the statute reflected Congress's effort to devise warnings, Congress delegated to the expert agency the authority to alter those warnings based on further study and developments. *See Philip Morris USA Inc. v. FDA*, No. 2:24-cv-143, 2025 WL 2494732, at *7 (S.D. Ga. Aug. 29, 2025) (concluding that the rule does not violate the TCA by requiring eleven

warnings since "FDA is not limited to the nine statements included in section 1333(a)(1)").

There is no basis in law or logic to conclude that Congress authorized FDA to alter the text of the warnings but not to change the number of warnings. Plaintiffs cannot seriously suggest, for example, that if FDA were to find that an existing warning no longer promotes public understanding of the risks of tobacco use—or even more seriously, that the warning is no longer supported by the science—FDA could not eliminate that warning. And it would be farfetched to conclude that it would be more faithful to the statutory scheme for FDA to be compelled to invent a new warning to replace the one that was no longer viable, just to remain at the magic number of nine. And it would be equally farfetched to suggest that if a significant and previously unknown health risk from tobacco use were discovered, it would better respect the statutory scheme for FDA to be prohibited from adding a warning about the new risk unless it eliminated another warning.

**2.** Viewing these statutory provisions in the context of the TCA as it was enacted confirms FDA's authority to revise the warnings. *See* Opening Br. 28-29. The relevant section of the TCA, Section 202, was titled

9

"Authority to Revise Cigarette Warning Label Statements" and had two subsections. *See* Family Smoking Prevention and Tobacco Control Act, Pub. L. No. 111-31, div. A, § 202, 123 Stat. 1776, 1845 (2009). The first was the amended preemption provision now codified at Section 1334(a), and the second was the provision now codified at Section 1333(d)[2]. The amendment to the preemption provision began: "Except to the extent the Secretary requires additional or different statements on any cigarette package … ." *See id.* Plaintiffs' suggestion that the "additional or different statements" language in this amendment refers only to statements other than the cigarette warnings at issue in this case (Resp. Br. 24-26) is difficult to square with Congress's inclusion of that amendment in a section of the enacted legislation in which the only other provision was about the warnings at issue here and no others, with a title that expressly refers to FDA's authority to revise cigarette warnings. It is the placement of these provisions in the TCA as it was enacted, rather than their placement in the U.S. Code (Resp. Br. 27), that is the most telling indication that Congress granted FDA the authority to add to or alter the statements at issue.

**3.** Plaintiffs' remaining arguments are unpersuasive. Their suggestion (Resp. Br. 16-17) that a rule requiring a combination of revised

and default warnings violates the requirement that packages and advertisements bear the warnings required by Section 1333 begs the question whether FDA is also authorized to alter the text of those warnings under Section 1333. Because the statute gives FDA the authority to do so, and it did, there is no "violat[ion]" to speak of. Resp. Br. 17.

It was also entirely natural for Congress to use the word "establish" to refer to disclosures that FDA must create from scratch and the word "adjust" to refer to changes that might be made to the default text warnings in the statute. *But see* Resp. Br. 20-21. Nor was there any need for Congress to separately list the number of warnings as a feature of the label requirements that FDA could alter (Resp. Br. 18-19)—just as there was no need for Congress to list other features of the labels, such as the number of words, that are bound up in the substantive content and may be adjusted as part of the "text." 15 U.S.C. § 1333(d)[2]. To the contrary, it would have been quite odd for Congress to expressly authorize FDA to change the number of warnings, given that nothing in the statute expressly says that there should be nine warnings. FDA's authority to adjust the text inherently encompasses authority to alter the number of warnings if doing so would promote public understanding of smoking's risks.

The TCA's requirement that manufacturers "randomly display[]" the warnings is likewise irrelevant to FDA's authority to revise the warnings. Resp. Br. 17.  It is no more difficult to rotate eleven warnings than nine, and to the extent the rotation requirement is relevant, it only highlights the weakness of plaintiffs' position.  Each cigarette package or advertisement will contain not nine warnings, or eleven, but will contain a single warning. *See* 15 U.S.C. § 1333(a)(1), (b)(1).  FDA has been expressly delegated the authority to adjust the text that will appear on that warning.

### C.    FDA's rulemaking did not violate any sequential rulemaking requirement.

Plaintiffs advance a similarly implausible understanding of the statute in asserting that FDA should have first issued a rule establishing color graphics accompanying the default text warnings under Section § 1333(d)[1] and then issued another rule adjusting the warnings under Section § 1333(d)[2] (Resp. Br. 36).  There is no indication in the statute that if FDA thinks warnings other than the statutory defaults may improve public understanding of the risks of tobacco use, FDA must first implement a suboptimal set of warnings, then wait fifteen months for those warnings to take effect, and then undertake another rulemaking to adjust those

warnings. *See Jones v. Hendrix*, 599 U.S. 465, 480 (2023) ("The illogical results of applying such an interpretation … argue strongly against the conclusion that Congress intended these results." (alteration in original) (quotation marks omitted)). Plaintiffs do not even attempt to reconcile their argument with their insistence (on the preceding page of their brief) that "any additional revisions to the warnings impose additional burden and expense on manufacturers." Resp. Br. 35.

Apart from its impracticality, plaintiffs' position is also unsupported by the text. When Congress authorized FDA to "adjust" the "text of any of the label requirements," 15 U.S.C. § 1333(d)[2], it plainly meant to authorize FDA to change the default warnings. The statute provides that "[i]t shall be unlawful" to manufacture or sell cigarette packages "which fail[] to bear, in accordance with the requirements of this section, one of the following labels," and then lists the default statements. 15 U.S.C. § 1333(a)(1). Those are "label requirements," and FDA has the authority to "adjust" them under 15 U.S.C. § 1333(d)[2], without regard to whether it has already devised the accompanying graphics or whether it is doing so at the same time.

Plaintiffs also argue that it was arbitrary and capricious for FDA to revise the text and graphics of the cigarette warnings in one rulemaking because there was no assessment of the "real-world effectiveness" of a hypothetical set of warnings consisting of the default TCA warnings and accompanying graphics. Resp. Br. 39; *see also* Resp. Br. 38. Again, this position is difficult to square with plaintiffs' insistence that it would be problematic to impose one set of label requirements only to change them shortly thereafter (Resp. Br. 35). In any event, FDA did evaluate the effectiveness of the default statutory warnings. As explained, FDA's multi-stage consumer-research study process began by comparing the effectiveness of the proposed revised and new statements to the nine default TCA statements. *See* 84 Fed. Reg. 42,754, 42,767 (Aug. 16, 2019). FDA then conducted additional studies, including one consumer research study that assessed the effectiveness of the existing Surgeon General's warnings compared to a set of proposed text-graphic warning pairings — pairings that included both revised warnings and default TCA statements. *See id.* at 42,768-72. There was nothing irrational about FDA selecting textual statements that would best promote public understanding and then selecting graphics to accompany them. The purpose of the graphics is to

ensure that consumers understand the messages set forth in the text, so it was sensible for FDA to first determine which messages were most important to convey and then ascertain how best to convey those messages.

### D. FDA's rulemaking was not arbitrary and capricious.

**1.** Plaintiffs' arbitrary-and-capricious challenges under the Administrative Procedure Act founder as well. Plaintiffs begin by repackaging their statutory challenge as a claim that FDA did not provide a "meaningful explanation" for the number of warnings it selected. Resp. Br. 40. But as explained, the statute does not require exactly nine warnings; instead, it permits FDA to adjust the default slate of warnings to identify warnings that better promote public understanding of smoking's risks.

FDA conducted precisely the analysis that the statute requires. As the final rule explains, FDA selected the eleven warnings through an extensive rulemaking process, which resulted in FDA finding that the chosen warnings will promote greater public understanding of the negative health consequences of smoking. *See* 85 Fed. Reg. 15,638, 15,640 (Mar. 18, 2020). FDA arrived at this conclusion after comparing the relative effectiveness of the chosen warnings to several alternatives and ruling out warnings that were less effective at promoting public understanding of

smoking's risks.  *See* Opening Br. 10-11.  In the final rule, FDA explained why it selected the warnings it did and why it was consistent with FDA's statutory authority to determine that eleven warnings were appropriate, rather than nine.  *See* 85 Fed. Reg. at 15,641-43.  That explanation satisfied FDA's obligations under the APA and TCA.

**2.**  Plaintiffs argue that the rule was arbitrary and capricious because "requiring nine warnings would be less costly."  Resp. Br. 41.  That argument adds little to their contention that it was independently important to Congress that there be exactly nine warnings.  Stripped of that erroneous premise, their argument unravels.  It may be less costly to manufacturers to impose seven warnings, or two warnings, or no warnings at all, but the costs to manufacturers were not what FDA was directed to optimize.  *See, e.g., American Textile Mfrs. Inst., Inc. v. Donovan*, 452 U.S. 490, 510 (1981) ("When Congress has intended that an agency engage in cost-benefit analysis, it has clearly indicated such intent on the face of the statute."); *cf. Michigan v. EPA*, 576 U.S. 743, 752 (2015) (statute required agency to find that regulation was "appropriate and necessary" and therefore required "at least some attention to cost").  The TCA provides that FDA may adopt "[c]hange[s] in required statements" if the Secretary

16

"finds that such a change would promote greater public understanding of the risks associated with the use of tobacco products." 15 U.S.C. § 1333(d)[2]. FDA met that standard. And to the extent the final rule addresses costs to manufacturers, that discussion is included pursuant to Executive Orders 12,866 and 13,563, both of which preclude judicial review of the cost-benefit analyses done pursuant to those orders. *See* 85 Fed. Reg. at 15,697; Exec. Order No. 12,866, § 10, 58 Fed. Reg. 51,735, 51,744 (Oct. 4, 1993); Exec. Order No. 13,563, § 7(d), 76 Fed. Reg. 3,821, 3,823 (Jan. 21, 2011); *National Truck Equip. Ass'n v. NHTSA*, 711 F.3d 662, 670 (6th Cir. 2013); *Air Transp. Ass'n of Am. v. FAA*, 169 F.3d 1, 8-9 (D.C. Cir. 1999).

Plaintiffs' insistence that FDA was required to weigh the difficult-to-quantify benefits of a better-informed public against the quantifiable costs to manufacturers (*see, e.g.*, Resp. Br. 42) ignores that Congress imposed a standard that focuses on public understanding and not on costs to manufacturers. That is the standard that properly governed FDA's rulemaking, and the final rule detailed how the evidence showed that each warning would promote public understanding of the harms of smoking. *See* 85 Fed. Reg. at 15,671-84; *Sinclair Wyo. Refin. Co. v. EPA*, 101 F.4th 871, 889 (D.C. Cir. 2024) (explaining that where "it would be infeasible to

monetize the benefits" of a rule, a "quantitative cost-benefit analysis can be misleading, because the calculation of new benefits does not provide a full evaluation of all relevant benefits and costs" (alteration and quotation marks omitted)).

This Court recognized the benefits of FDA's new warnings in the prior appeal, opting not to second-guess the agency's findings that "the Warnings directly alleviate information asymmetry regarding the harms tobacco causes and consumers' sub-optimal awareness of and response to those harms." *R.J. Reynolds Tobacco Co. v. FDA*, 96 F.4th 863, 886 (5th Cir.), *cert. denied*, 145 S. Ct. 592 (2024). The Court noted that because "the government has shown a significant benefit from the resultant reduction in those harms," the "scale tilts toward the benefits," and on that basis, concluded that "the Warnings are not unduly burdensome" under the First Amendment. *Id.*

This Court's analysis applies with even more force to foreclose plaintiffs' arbitrary-and-capricious challenges, given the deferential review afforded to agency actions under the APA. *See Gulf Restoration Network v. U.S. Dep't of Transp.*, 452 F.3d 362, 368 (5th Cir. 2006). Courts are "most deferential in reviewing [an] agency's findings" when the "agency's

particular technical expertise is involved." *Medina Cnty. Env't Action Ass'n v. Surface Transp. Bd.*, 602 F.3d 687, 699 (5th Cir. 2010); *accord Seven Cnty. Infrastructure Coal. v. Eagle County*, 145 S. Ct. 1497, 1512 (2025); *FDA v. Wages & White Lion Invs., LLC*, 604 U.S. 542, 567 (2025).

**3.**  Plaintiffs' other arbitrary-and-capricious challenges likewise fail. Plaintiffs' challenge to FDA's selection of metrics to assess the effectiveness of different warnings appears to be premised on a misunderstanding of FDA's rigorous scientific analysis.  Although FDA identified a number of metrics by which potential warnings could be measured, FDA explained that "communication science research has found that people are more likely to pay attention to information that is new, and attention plays a vital role in message comprehension and learning," and further explained that two metrics—"new information" and "self-reported learning"—are "predictive of improved understanding."  84 Fed. Reg. at 42,769.  "Other study outcomes, such as 'thinking about the risks' and 'health beliefs,' were unlikely to change with a single brief exposure to the text-only statements—as was provided in [the] first quantitative consumer research study—and therefore were not considered predictive of improved understanding in the way the 'new information' and 'self-reported

learning' measures were." *Id.* Thus, before undertaking the studies, "FDA determined that, to be considered for the final rule, a tested warning would need to demonstrate statistically significantly better performance than the control … on these two 'new information' and 'self-reported learning' outcome measures." 85 Fed. Reg. at 15,659; *see also id.* at 15,662.

Selecting the criteria that will be used to measure the effectiveness of the warnings and then selecting warnings that satisfy those criteria constitutes reasoned decisionmaking. That the warnings did not perform as well on other metrics—metrics that FDA deemed "not … predictive" of improved public understanding, Resp. Br. 49—does not mean that "the warnings failed," as plaintiffs suggest, Resp. Br. 43. Plaintiffs would be hard-pressed to argue that FDA's selected criteria were inappropriate as a scientific matter, given the deference owed FDA on these sorts of scientific determinations. And plaintiffs devote little effort to doing so in any event, instead arguing that FDA selected the relevant metrics after the fact, which was not the case, and resorting to a fanciful discussion of a children's story (Resp. Br. 48). That is not a basis to overturn FDA's scientific judgment about the appropriate metrics to measure the effectiveness of the warnings. *See Kennecott Greens Creek Mining Co. v. Mine Safety & Health Admin.*, 476

F.3d 946, 956 (D.C. Cir. 2007) (explaining that "methodology and data analysis" decisions are within the "agency's technical expertise" (alteration and quotation marks omitted)).

Plaintiffs greatly understate the effectiveness of the warnings even on their preferred metrics. As FDA explained, "the final required warnings … demonstrated statistically significant improvement in nearly all other measures of understanding when compared to the Surgeon General's warnings," and "all 11 final required warnings … led to more thinking about risks; were higher on perceived informativeness, perceived understandability, and perceived helpfulness understanding health effects; attracted more attention; and were better recalled." 85 Fed. Reg. at 15,658.

Next, plaintiffs identify concerns that peer reviewers raised with the empirical studies on which FDA relied — namely, "concern[s] that FDA did not use 'standard' measures, and failed to demonstrate the validity of its novel measures" — and assert that "FDA made no meaningful effort to address these fundamental flaws, offering no substantive revisions." Resp. Br. 47. The final rule disproves plaintiffs' contentions. On the very page of the final rule that plaintiffs cite, FDA stated that in response to the comments to which plaintiffs refer, FDA added "[d]etails about the design

of the study, including an explanation of the theory that informed the selection of health belief items evaluated." ROA.9907. Plaintiffs may disagree with the adequacy of these responses, but they can hardly be described as a failure to make "substantive revisions." Resp. Br. 47. And these revisions responded to the very concerns plaintiffs now identify; one of the peer reviewers on whom plaintiffs rely, for example, recommended that "[t]he [study] report would be stronger if it provided citations separately for each measure used," ROA.9798, and FDA did precisely that in its revised report, *see* ROA.9571-9572. Plaintiffs' reliance on comments without addressing FDA's response to those very comments would provide no basis to overturn FDA's scientific judgment, even if a disagreement among experts would suffice to do so. *But see Medina Cnty.*, 602 F.3d at 699 (explaining that even where "specialists express conflicting views, an agency must have discretion to rely on the reasonable opinions of its own qualified experts even if, as an original matter, [the reviewing court] might find contrary views more persuasive").

Notwithstanding their scattershot attempts to cast doubt on FDA's measures, plaintiffs do not contest that FDA's choice of metrics was rooted in the scientific literature and that multiple peer reviewers endorsed FDA's

use of these metrics—and that FDA explained all of this.  *See* ROA.9571-9572, ROA.9836, ROA.9844; 84 Fed. Reg. at 42,769.  This was reasoned decision-making through and through.  *See American Hosp. Ass'n v. Azar*, 983 F.3d 528, 536 (D.C. Cir. 2020) ("When an agency's decision is primarily predictive," courts "require only that the agency acknowledge factual uncertainties and identify the considerations it found persuasive."); *see also Philip Morris*, 2025 WL 2494732, at *9 ("[E]ven if the Court or commenters … disagree with the FDA's decision to rely on the variables "new information" and "self-reported learning" as indicia of "understanding," that does not make the Agency's action arbitrary and capricious[.]").

Finally, plaintiffs' assertion that this Court should not defer to the agency's interpretation of the TCA under *Loper Bright Enterprises v. Raimondo*, 603 U.S. 369 (2024), (Resp. Br. 49) has no relevance to this Court's review of FDA's exercise of scientific judgment about how to measure public understanding in this specific context.  This is a judgment that Congress recognized to be within FDA's scientific expertise, which is reviewed deferentially under the APA.  *See* 21 U.S.C. § 387 note (Legislative Finding 44) (finding that FDA has "the scientific expertise … to evaluate the impact of labels … and promote understanding of the impact of the

product on health"); 15 U.S.C. § 1333(d)[2] (authorizing FDA to change the warnings "if the Secretary finds" that the change would improve public understanding of tobacco's risks); *see Loper Bright*, 603 U.S. at 392 (explaining that the APA "mandate[s] that judicial review of agency policymaking and factfinding be deferential").

## II.  No Preliminary Injunction Was Warranted.

Because plaintiffs have failed to show a likelihood of success on the merits, this Court should reverse the district court's preliminary injunction on that ground alone.  But in any event, plaintiffs are wrong to suggest that the other preliminary-injunction factors support the relief the district court entered.  Plaintiffs suggest that FDA "has never disputed" irreparable harm, Resp. Br. 49-50, but as FDA explained in district court and plaintiffs did not dispute, the rule will not be enforced against them until February 2026 at the earliest, *see* ROA.10529.  Plaintiffs' litigation tactics also undermine their claims of irreparable harm.  Following the last appeal, instead of seeking expeditious resolution of their APA claims, which were previously briefed before both the district court and this Court, plaintiffs asked the district court—over the government's objection—to place the litigation on hold, while they sought Supreme Court review of their

constitutional claims, without having represented any need for emergency relief at the time.  *See* ROA.10314-10319, ROA.10367-10369.

Plaintiffs also downplay the importance of FDA carrying out Congress's mandate that the public be better informed of the risks of tobacco use.  As Congress found in the TCA, "[i]t is in the public interest for Congress to enact legislation that provides the [FDA] with the authority to regulate tobacco products and the advertising and promotion of such products," and the "benefits to the American people from enacting such legislation would be significant in human and economic terms."  21 U.S.C. § 387 note (Legislative Finding 12).

Congress enacted the TCA more than fifteen years ago, directing FDA to update the more than forty-year-old Surgeon General's warnings on cigarette packages and in cigarette advertisements, and FDA issued the updated warnings rule in March 2020, after years of study.  More than five years later, the rule has yet to go into effect, due to ongoing litigation. Because plaintiffs have failed to show that the balance of equities is in favor of the tobacco industry, instead of the public that Congress strove to protect, preliminary relief is not warranted.

## III.   Any Relief Should Be Limited to the Parties and the Invalid Aspects of the Rule.

**A. 1.**   Even if plaintiffs were entitled to preliminary relief, the district court's remedy was overbroad.  In the TCA, Congress expressly precluded the entry of relief that runs to non-parties, with Section 5 of the legislation providing that if "the application of any … provision [of the TCA] to any person or circumstance is held to be invalid, the remainder [of the TCA] … and the application of such provisions to any other person or circumstance shall not be affected and shall continue to be enforced to the fullest extent possible." 21 U.S.C. § 387 note.  The final rule incorporates this statutory guardrail, stating that "[c]onsistent with section 5 of the [TCA], FDA intends for the various requirements established by this rulemaking to be severable." 85 Fed. Reg. at 15,695.  As FDA explained in a part of the rule not challenged here, FDA "determined that severability both is consistent with Congressional intent and would best advance the Government's interest in promoting greater public understanding of the negative health consequences of cigarette smoking," because it would preserve the rule implementing the TCA's directives to the maximum extent possible.  *Id.*

Plaintiffs dismiss the severability provision by suggesting that it only provides what is already true—namely, that if a plaintiff were to succeed in an as-applied challenge, the statute would continue to apply in other circumstances—in essence, that the provision is superfluous (Resp. Br. 53). The provision is not so limited, however, for it also provides that relief should not be granted to parties not before the court. The Supreme Court's recent emphatic rejection of nonparty relief in *Trump v. CASA, Inc.*, 606 U.S. 831, 861-62 (2025), only underscores the impropriety of nonparty relief here, where both Congress and the agency have addressed the matter.

Nor is universal relief proper under equitable principles long espoused by this Court, as well as the APA. Time and again, this Court has reiterated that "[r]emedies must be 'tailored to redress' a plaintiff's injury, and equitable remedies such as injunctions should not provide more relief than 'necessary to give the prevailing party the relief to which [it] is entitled.'" *Texas v. United States*, 126 F.4th 392, 420 (5th Cir. 2025) (second alteration in original) (citation omitted). The applicability of that equitable principle here is underscored by the district-court decision in *Philip Morris USA Inc. v. FDA,* No. 2:24-cv-143, 2025 WL 2494732 (S.D. Ga. Aug. 29, 2025), which vacated the rule on a different ground and thus highlighted

the problem recognized even by the dissenters in *CASA*: universal injunctions "operate asymmetrically against the Government, giving plaintiffs a litigation advantage: To halt Government action everywhere, a plaintiff must win only one universal injunction across many potential lawsuits." *CASA*, 606 U.S. at 900 (Sotomayor, J., dissenting).

The APA expressly incorporates limitations on non-party relief by permitting a court to stay agency action only "to the extent necessary to prevent irreparable injury," 5 U.S.C. § 705, and providing that a court retains the authority to "deny relief on" any "equitable ground," *id.* § 702. These settled equitable principles inform whether a party is entitled to the postponement of a rule's effective date under the APA. And a party's entitlement to preliminary injunctive relief and a Section 705 stay under the APA are guided by the same factors. *See Airlines for Am. v. Department of Transp.*, 110 F.4th 672, 674 (5th Cir. 2024). In short, plaintiffs are incorrect that this Court's precedent addressing the equitable principles governing injunctive relief "do not apply" here. Resp. Br. 54. And contrary to plaintiffs' assertions (Resp. Br. 50, 53), FDA's arguments necessarily address both forms of interim relief—neither of which is appropriate here.

There is no serious dispute that relief under 5 U.S.C. § 705 is discretionary. Even the case on which plaintiffs rely, *Career Colleges & Schools of Texas v. U.S. Department of Education*, 98 F.4th 220 (5th Cir. 2024), assessed the balance of harms and the public interest before determining that preliminary relief was warranted. *See id.* at 254-55. Given the preliminary injunction in favor of the plaintiffs, the equities disfavor a broader Section 705 stay.

Party-specific relief that permits the rule to take effect as to non-parties while the litigation proceeds is particularly appropriate here, where the district court opted not to disturb the agency's conclusion that the updated warnings would promote greater public understanding of the risks of tobacco use, and where the district court recognized that FDA "ha[s] a substantial likelihood of ultimate success after further analysis" on one claim. ROA.10590. And the public interest would be benefited, not harmed, by relief that is limited to the parties and the portions of the rule that are successfully challenged. *See* 85 Fed. Reg. at 15,697.

Plaintiffs' professed concern with the competitive disadvantage that their competitors would face if the rule were enjoined as to plaintiffs but not other cigarette manufacturers (Resp. Br. 52-53) underscores the degree

to which plaintiffs have strayed from ordinary principles of party-specific relief.  In any event, plaintiffs' assertion that universal relief is necessary "to afford Plaintiffs complete relief," because "non-plaintiff retailers" might "stop stocking and selling non-compliant cigarettes," is premised on pure speculation.  Resp. Br. 53.  And this Court's authority does not properly extend to restraining the actions of non-parties on the basis of mere conjecture about how non-parties might respond to tailored judicial relief.

The D.C. Circuit's 2012 decision in *R.J. Reynolds Tobacco Co. v. FDA*, 696 F.3d 1205 (D.C. Cir. 2012), vacating FDA's 2011 warnings rule does not support plaintiffs' request for universal relief in this case (Resp. Br. 54).  In its 2012 decision, the D.C. Circuit affirmed a final judgment entered by the district court, agreeing with plaintiffs' First Amendment challenges to FDA's prior rule.  *See R.J. Reynolds*, 696 F.3d at 1222.  That case has no bearing on whether interim relief entered by a district court that lacks nationwide jurisdiction was appropriate based on a different theory.

**2.**  Even the case on which plaintiffs rely makes clear that relief should only be granted as to the portions of the rule held to be unlawful.  *See Career Colls.*, 98 F.4th at 255 (noting that any relief under Section 705 must be limited to the portions of the rule that a plaintiff "*actually challenges*

30

and for which it has shown a likelihood of success on the merits"). Thus, even if this Court were to conclude that plaintiffs were likely to succeed on the merits, more tailored relief would be appropriate. Two of the warnings use the TCA's default text, and another five warnings make only small changes to the default text to provide additional information about health conditions in the default statements. Even the district court did not conclude that those smaller changes would fall outside FDA's Section 1333(d)[2] authority to adjust the text of the warnings to enhance public understanding of tobacco's risks. If this Court shares plaintiffs' views regarding the new warnings, the seven warnings that implement either the default TCA text or slightly revised text should be preserved, consistent with the statute's severability provision. *See* 85 Fed. Reg. at 15,967.

**B.** Plaintiffs close their brief with the extraordinary suggestion that even if the government wins this appeal, this Court should "direct that the compliance period will be 15 months … after this Court issues the mandate, or, at minimum, 13 months and 12 days after issuance of the mandate." Resp. Br. 58. There is no basis for this Court to determine, based on a few paragraphs of argument, how the statute and the rule should be applied in circumstances that neither the agency nor the district

court has addressed, particularly since plaintiffs themselves cannot decide upon the appropriate answer (Resp. Br. 58).

Plaintiffs' reasoning is, on its own terms, premised on the purposes of a Section 705 postponement that, by hypothesis, this Court has concluded was entered in error. FDA may conclude that there are nonetheless sufficient reliance interests to justify a further exercise of enforcement discretion of some length, but there is no basis for this Court to prejudge that issue. The district court's judgment that is the subject of this appeal should be reversed, and no additional order should be entered.

# CONCLUSION

For the foregoing reasons, the judgment of the district court should be reversed.

Respectfully submitted,

*Of Counsel:*

ROBERT FOX FOSTER
*Acting General Counsel*
*Department of Health & Human Services*
*Chief Counsel for Food, Research & Drugs*

SEAN R. KEVENEY
*Chief Counsel*
*Food & Drug Administration*

WENDY S. VICENTE
*Deputy Chief Counsel, Litigation*

JULIE LOVAS
*Senior Counsel*
*Office of the Chief Counsel*

OCTOBER 2025

ERIC D. MCARTHUR
*Deputy Assistant Attorney General*

JAY R. COMBS
*Acting United States Attorney*

DANIEL TENNY

*s/ Urja Mittal*
URJA MITTAL
*Attorneys, Appellate Staff*
*Civil Division, Room 7248*
*U.S. Department of Justice*
*950 Pennsylvania Avenue NW*
*Washington, DC 20530*
*(202) 353-4895*
*urja.mittal@usdoj.gov*

## CERTIFICATE OF SERVICE

I hereby certify that on October 1, 2025, I electronically filed the foregoing brief with the Clerk of the Court for the United States Court of Appeals for the Fifth Circuit by using the appellate CM/ECF system. Service will be accomplished by the appellate CM/ECF system.

*s/ Urja Mittal*
URJA MITTAL

## CERTIFICATE OF COMPLIANCE

This brief complies with the type-volume limit of Federal Rule of Appellate Procedure 32(a)(7)(B) because it contains 6,500 words. This brief also complies with the typeface and type-style requirements of Federal Rules of Appellate Procedure 32(a)(5) and 32(a)(6) because it was prepared using Word for Microsoft 365 in Book Antiqua 14-point font, a proportionally spaced typeface.

*s/ Urja Mittal*
URJA MITTAL